BAILES, Judge.
This appeal is from the judgment of the trial court denying recovery to plaintiff, Binnings Construction Company, Inc. (Bin-nings), of alleged expenses incurred in moving pile driving equipment to the construction site on the Louisiana State University campus at Baton Rouge in anticipation of performing work under a subcontract from defendant, Carpenter Brothers, Inc. (Carpenter). Also named defendant in this action was Louisiana State University and Agricultural and Mechanical College (LSU). On an exception to venue LSU was dismissed as a defendant in the main demand, however it was retained at the trial level as third party defendant to the third party demand asserted by Carpenter. Further, Carpenter reconvened against Binnings to recover the sum of $700.00 representing the additional cost of contracting for the construction work originally to be undertaken by Binnings.
In addition to the trial court rejecting plaintiff’s claim against defendant, the defendant’s reconventional demand was rejected as well as its third party demand against the third party defendant, LSU. The defendant, Carpenter, has answered the appeal of Binnings urging that judgment be awarded in its favor for $700.00.
The judgments of the trial court dismissing LSU from the principal demand on the exception to venue and the rejection of the third party demands of Carpenter against LSU are final as no appeal was taken therefrom.
The dispute between the parties arose from a contract between LSU and Carpenter for the construction of the Joan Chaffe Miller Hall, a dormitory on the main campus of LSU at Baton Rouge.
In furtherance of performance under the contract, Carpenter offered for bidding the work of furnishing and driving cast-in-place piles for this building. There is no dispute between the parties about the price or other contract conditions, except a question arose as to the type of pile to be furnished and driven by Binnings. This dispute arose out of a divergence of interpretation of what type pile was required by the specifications.
We quote here the pertinent portions of the General Conditions and specifications of the contract between LSU and Carpenter, all of which the plaintiff either had actual knowedge of or is charged with constructive knowledge. From the testimony of witnesses knowledgeable about such matters, it appears to be a fair statement that the general conditions are standard for contracts of this type.
*752 “GENERAL CONDITIONS
« * * *
“35. Architect/Engineer’s Authority
“The Architect/Engineer shall give all orders and directions contemplated under this contract and specifications relative to the execution of the work. The Architect/Engineer shall determine the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract and shall decide all questions which may arise in relation to said work and the construction thereof. The Architect/Engineer’s estimates and decisions shall be final and conclusive, except as herein otherwise expressly provided. In case any question shall arise between the parties hereto relative to said contract or specifications, the determination or decision of the Architect/Engineer shall be a condition precedent to the right of the Contractor to receive any money or payment for work under this contract affected in any manner or to any extent by such question.
“The Architect/Engineer shall decide the meaning and intent of any portion of the specifications and of any plans or drawings where the same may be found obscure or be in dispute. Any differences or conflicts in regard to their work which may arise between the Contractor under this contract and other Contractors performing work for the Owner shall be adjusted and determined by the Architect/Engineer.
“ * * *
“FOUNDATION PILING
“SCOPE
“All general and supplemental conditions of the contract shall apply to all work included under this Division.
“Contractor shall furnish and drive, complete in place, all steel encased poured-in-place concrete piling shown on the drawings or specified and shall furnish and/or perform all other work and services specified herein.
“GENERAL
“The foundations are 'based on a bearing capacity of 50 tons for each pile. The pile lengths shall be 60 feet extending from cut off elevations, except as may be modified.
“No piles, other than control piles, shall be ordered until loading of test piles has been completed. The Architect will promptly consult with the contractor as to the lengths of piles to be ordered after correlating data obtained from load tests and control piles. Should radical change in design be advisable on the basis of the results of the load tests, the contractor will be promptly notified.
“Eight (8) sample soil borings were made at the site and the complete report of the findings is available at the Architect’s office for the guidance of the contractors. The information furnished on these logs is believed to be correct but is not guaranteed to prevail over the entire site.
“The contractor’s attention is directed to “Excavating, Filling, Backfilling”, Division 2, for piling excavation.
“TYPES OF PILES AND MATERIAL SPECIFICATIONS
“In each case in the following types of piling specified, weights, thickness and diameters specified are the minimum acceptable for design load carrying capacity.
“It shall be the contractor’s responsibility to select adequate metal thickness and piling sections to enable the pile to withstand the driving stresses and lateral pressures imposed upon the piles due to driving adjacent piles and due to lateral earth pressures without buckling or crushing.
“TYPE A_* * *
*753 “TYPE B_* * *
“TYPE C — Composite Steel Pipe, Spirally Corrugated Steel Shell Piles Concrete Pilled: These piles shall he cast-in-place concrete filled Armco Hel-cor Shell Piles as furnished by the Armco Drainage and Metal Products, Inc. Piles shall be a spirally corrugated steel shell casing driven in contact with the ground and left in place. The Helcor shell section shall have a nominal diameter of 1214" and shall be closed at the tip end with a suitable flat steel plate.”
While the trial judge did not assign written reasons for judgment, it does appear that he found the Architect-Engineer had the authority, under the general conditions of the contract, to determine the acceptability of any and all materials relating to fulfillment of the contract; and it further appears that he decided that the pile proposed by the plaintiff did not have the approval of the Architect-Engineer; that this approval was a suspensive condition of the contract which resulted in there being no binding contract between the parties unless and until the plaintiff met this condition. Thus, if there was no contract there was no liability by the defendant to the plaintiff for expenses in moving the equipment to the job site. Likewise, if there was no contract between the parties, there would be no liability by plaintiff to defendant for the differential between the price of the alleged contract and the consideration of the contract subsequently entered into between defendant and the contractor which actually drove the piles.
Plaintiff argues that the trial court erred in not finding a valid and binding contract between Binnings and Carpenter, and that it also erred in holding that the Architect-Engineer’s authority to interpret the contract and approve the subcontractors and materials barred appellant’s recovery.
It appears clear from the evidence that with the letter confirming the quotation of plaintiff to defendant to furnish and drive piles for $83,800.00, there was attached a sketch of the piles to be used on the job, and on November 16, 1966, defendant wrote the architect for approval of the type of pile proposed by plaintiff. On November 25, 1966, the architect wrote defendant that the proposed substitute pile was not acceptable, which advice was forwarded to plaintiff and received by it on November 28, 1966, subsequent to moving pile driving equipment to the job site. On November 29, 1966, a meeting was held at the office of the job engineer, Mr. E. E. Evans, in Baton Rouge, with representatives of all parties in attendance, for the purpose of clarifying the type of pile required by the specifications.
The result of this meeting was the unequivocal rejection by the engineer of the composite pile proposed by plaintiff. It was at this meeting that the engineer made it certain that the pile described in the text of the description of Type C pile in the specification was the only pile that would be permitted. Admittedly, plaintiff was unable to drive this type pile because it did not have access, economically, to a mandrel of the required length to drive 70 foot piles.
Mr. George F. Corcoran, the officer of Binnings who handled the negotiations with defendant, testified that he had no knowledge prior to moving on the job that the proposed piles did not meet specifications, although he did state that the plaintiff’s bid was predicated on the plans and specifications and that he assumed the pile proposed would meet the specifications. He acknowledged that the description in the title of Type C pile was ambiguous when compared with the text of the specification.
As to the plaintiff’s inability to furnish and drive the pile called for in the specifications, Mr. Corcoran testified as follows:
“Q Did Mr. Evans ever tell you, Mr. Corcoran why as the Engineer and why he and the Architect and L.S.U. d«d not accept what Carpenter Brothers had ,proposed for the University as to the pilings? Did he ever explain to you his reasons?
*754 “A As best I recall there was mention of further information that he had obtained that would indicate he would want the full pile and that’s what he intended it to be.
“Q He made it clear to you he wanted a full pile, full length. Is the piling concrete ?
“A That’s right.
“Q As distinguished from what you described you were able to do ?
“A That’s right.
“Q You were not able to furnish or supply a full length concrete Helcor pile as Mr. Evans stated he wanted, is that right, sir?
“A We were not able to furnish — may I elaborate on that, sir?
“Q I want to know whether you were able at that time—
“THE COURT:
“You can answer the question if you can, yes, or no, and then explain your answer.
“THE WITNESS:
“No, economically there was no way of furnishing that.
“BY MR. CAMPBELL:
“Q You did not offer to furnish what he stated he wanted is that right ?
“A We felt we offered what he wanted
“Q I didn’t ask you that, I asked whether or not you offered to produce what Mr. Evans told you he wanted as he interpreted the contract ?
“A We did offer to drive a 12" concrete pile for the full length.
“Q I am going to ask you one more time—
“THE COURT:
“He answered; he didn’t offer.
“BY MR. CAMPBELL:
“Q That’s correct. Your answer is, no, you didn’t offer to do it?
“A Yes.
“THE COURT:
“His answer is, ‘Yes, we did not offer.’
“BY MR. CAMPBELL:
“Q That was primarily as you said, not being set up or so equipped as to be able to physically handle that type of piling Mr. Evans said he wanted. Economically—
“THE COURT:
“Let him answer your question.
“THE WITNESS:
“We were set up to drive the type of piling the specifications said were required. We were not prepared to drive the type of piling that Mr. Evans called what he meant.
“BY MR. CAMPBELL :
“Q Is it fair to say when you went to the meeting in Baton Rouge in Mr. Evans’ office you and your company on the one hand felt that whatever you had proposed conformed with the Type C type pile that was called for on the specifications but on the other hand the University through it’s Architect and Engineer felt that what you proposed did not conform to the plans and specifications?
“A You are asking me to conclude that was the result of the meeting. That substantially is the result of what happened.
“Q That set up the failure of the parties to agree?
“A That’s the dispute in court, sir.
“Q At that meeting Mr. Evans interpreted or clarified the meaning of the specifications in his opinion on behalf of the University and made his decision, rendered it that day and you left Baton Rouge knowing what his decision was, is that right, sir ?
*755 “A This is right.
“Q Did either the Architect or Engineer — did L. S. U. in connection with this job ever subsequently indicate to you that either or both of them had changed his mind as to the decision and interpretation that had been made with respect to your proposal?
“A No.”
Mr. Wallace Gammon, salesman for Armco, called by the paintiff, testified that the specifications were ambiguous. And, in rebuttal, plaintiff called Mr. Walter E. Blessey, a professor at Tulane University and a practicing structural engineer, who testified that there was a conflict between the title and the text of the specifications describing the Type C pile. He stated one contradicts the other. He testified that normally conflicts are resolved prior to bidding.
The two structural engineers on the job testified that the pile proposed by plaintiff was a substitute for the Type C specified; that the proposed pile was rejected as not conforming to specifications.
It is clear that the plaintiff fell into error by not obtaining a clarification of the type pile required for this job prior to submitting its bid and moving its pile driving equipment to the job. Admittedly there was a conflict or ambiguity between the title and the text of the description of the Type C pile.
Plaintiff, in its brief, argues the question of fact of exactly what pile was intended by the specifications. We find that upon proof that an ambiguity existed, this having been testified to by Mr. Binnings, Mr. Gammon and Mr. Blessey, whose testimony was ten red by plaintiff, the plaintiff was forewarned that a clarification was necessary certainly before moving its equipment to the job site.
From the nature of the contract for the driving of piles there was an implied condition that the piles would conform to the plans and specifications of the general contract between the owner and the builder. Further, we find that the obligation of the plaintiff to furnish such piles was a suspensive condition of the contract between the parties.
Therefore, it is obvious that the award of the contract by the defendant to the plaintiff was subject to the suspensive condition, and while not expressly so stated in the contract it was implied from the nature of the contract. See R.C.C. Article 2026.
R.C.C. Article 2021 states:
“Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition.
Further, R.C.C. Article 2043 provides:
“The obligation contracted on a sus-pensive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties.
“In the former case, the obligation can not be executed till after the event; in the latter, the obligation has its effect from the day on which it was contracted, but it can not be enforced until the event be known.”
Although the facts are somewhat different, we believe what was stated by the court in the case of Blaushild v. Rockhold et al., 7 La.App. 709, at page 711, is apropos to the instant case. Therein the court stated:
“The substance of the defense is that the contract with plaintiff was only a conditional obligation or one entered into with a suspensive condition, to-wit: that J. W. Smith, the architect, would approve the contract; that the condition upon *756 which the contract depended to make it valid and binding failed because the architect refused to approve it, and that therefore defendant is not bound.
“We have no difficulty in reaching the conclusion that the contract was entered into with a suspensive condition, and while that condition is not expressed in the written instrument itself, it is implied from the nature of the contract and the presumed intent of the parties.
“The parties to the contract well knew that the principal contractor could not sublet any of the work on the building to anyone who was not satisfactory to the architect.
“Plaintiff was familiar with the general rule that the architect must approve all subcontracts. Besides this, the contract was entered into with special reference to the specifications, which were made a part of it.
“These specifications provided in specific terms that the contractor should not employ any sub-contractor — ‘that the architect may within a reasonable time object to as incompetent or unfit’.
“Blaushild was familiar with these specifications. He had a copy of them and said he had read them before the contract was signed. He knew that he could not do the work without the sanction of the architect and he knew that the contract entered into could not ripen into a valid and binding obligation except upon condition that the architect would approve it.”
Also see: Detroit Football Company v. Robinson, D.C., 186 F.Supp. 933, and Pyro Incinerator & Supply Corp. v. Gervais F. Favrot Co., La.App., 210 So.2d 356 (1968).
The plaintiff argues that it would be unjust to permit the Architect-Engineer to render a binding interpretation concerning what type pile was intended by the word description of the pile as contained in the specifications for the reason the error was made by the Architect-Engineer. Further, it argues that the standard required of the Architect-Engineer should be one of ordinary and reasonable care as opposed to the standard of arbitrary and capricious conduct advocated in J. H. Jenkins Contractor, Inc. v. City of Denham Springs, La.App., 216 So.2d 549 (1968). The fact that admittedly there was an obvious ambiguity in the description of the pile precludes our consideration of this argument.
We are urged to consider the interpretative principle of contracts that ambiguous language in a contract is construed against its preparer, citing R.C.C. Articles 1957 and 1958. Appellant argues that “(T)he-law requires that Appellant be given the most favorable construction of the language. When Appellant submitted its bid, which was accepted, it beieved it was meeting the specification. It only learned after its damages had been sustained that a composite pile was not intended.”
This argument is not applicable to the instant case. Carpenter did not draft the contract specifications. Suffice it to say that the contract between plaintiff and defendant was confected on the implied sus-pensive condition that the piles to be furnished and driven by plaintiff would conform to the specifications as interpreted by the Architect-Engineer. It is no more Carpenter’s fault than Binnings’ that the specifications were ambiguous.
For the foregoing reasons, the judgment appealed from is affirmed at appellant’s cost.
Affirmed.